**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-24727-CIV-SIMONTON**

LUIS ORLANDO SENSAT,

       Plaintiff,

 v.

NANCY A. BERRYHILL, Acting Commissioner
of Social Security Administration,

       Defendant.

_____/

<u>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**</u>

    This matter is before the Court on the cross-motions for summary judgment filed

by Plaintiff Luis Orlando Sensat ("Plaintiff") and by Defendant Nancy A. Berryhill[1],

("Defendant"), Acting Commissioner of Social Security Administration, ECF Nos. [24] [29].

The Plaintiff has also filed a Response in Opposition to Defendant's Motion for Summary

Judgment, ECF No. [33]. Based upon the consent of the parties, the Honorable Kathleen

M. Williams, United States District Judge, has referred the matter to the undersigned to

take all necessary and proper action as required by law, through and including trial by

jury and entry of final judgment, ECF No. [21]. The summary judgment motions are now

ripe for disposition.

    For the reasons stated below, the undersigned hereby **GRANTS** the Plaintiff's

Motion, ECF No. [24], and **DENIES** the Defendant's Motion for Summary Judgment, ECF

No. [29]. This case is **REMANDED** to the Commissioner in accordance with this Order.

---

[1] On January 23, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting
Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil
Procedure 25(d), Nancy A. Berryhill is automatically substituted as the Defendant in this
case.

## I.     PROCEDURAL BACKGROUND

On February 1, 2012, the Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning January 23, 2012. (R. 236).[2] The Plaintiff also filed a Title XVI application for supplemental security income on the same date. (R. 230). The claim was denied initially on February 24, 2012, and upon reconsideration on May 24, 2012. (R. 102, 117). On January 30, 2014, a hearing was held in front of an Administrative Law Judge ("ALJ") in Miami, Florida. (R. 34-96). At the hearing, the ALJ heard telephonic testimony from an impartial vocational expert ("VE"), Steve Bast, and the Plaintiff, who was represented by counsel. (R. 34-96). On March 21, 2014, the ALJ concluded that the Plaintiff was not disabled under section 216(i) and 223(d) of the Social Security Act from January 23, 2012, through the date of the ALJ's decision, pursuant to 20 CFR §§ 404.1520(g) and 416.920(g). (R. 174).

The Plaintiff requested review from the Social Security Administration Appeals Council, which denied review. (R.1-3). Having exhausted all administrative remedies, Plaintiff timely filed the pending Complaint seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. §405(g). ECF No. [26].

## II.    LEGAL ISSUES PRESENTED

The Plaintiff asserts that the ALJ committed the following errors, in determining that he was not disabled.

1.  The ALJ did not consider all of the Plaintiff's impairments nor all of the relevant evidence, and the ALJ did not correctly understand and evaluate the Plaintiff's testimony.

---

[2] The letter "R", followed by a page number is used to designate a page in the Administrative Record, which is contained in ECF No. [18].

2.  **Substantial evidence of record does not support the ALJ's finding that the Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.**

3.  **The ALJ's residual functional capacity determination does not comply with Social Security Ruling 96-8P.**

4.  **The ALJ did not state what weight, if any, he gave to the psychoeducational evaluation report from Michael Quiroga, Ph.D.**

5.  **The ALJ refused to help fully develop the record and took an adversarial role in what is supposed to be a non-adversarial proceeding.**

6.  **The substantial evidence of record does not support the ALJ's credibility determination regarding the Plaintiff.**

7.  **The substantial evidence of record does not support the ALJ's finding that there are jobs that exist in significant numbers that the Plaintiff can perform.**

**ECF No. [245].**

III.     **PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY**

A.  **Background**

The Plaintiff was born on September 27, 1985 in Miami, Florida. (R. 236).  He weighs approximately 220 lbs and is 5' 8'' (R. 298). The Plaintiff graduated from Coral Gables High School in 2005, having received a special diploma due to his learning disabilities.  (R. 40, 299).  The Plaintiff attended special education classes beginning in the sixth grade, and he repeated twelfth grade.  (R. 415).

B.  **Medical History**

1.  **Mental Health History**

As noted above, the Plaintiff attended special education classes while in high school and received a "special diploma," indicating that the Plaintiff attended exceptional student education classes, and had his F-CAT examination requirement

3

waived.  (R. 415, 558).    On July 23, 2007, the Plaintiff underwent a psychoeducational evaluation.  The Plaintiff was referred for the evaluation in order to assess the Plaintiff's levels of cognitive and academic function to facilitate the formulation of a treatment plan. At the evaluation, the Plaintiff described some difficulty with his birth, in which he reported that the umbilical cord was wrapped around him.  (R. 558).  The Plaintiff denied having ever attended sessions with a psychiatrist or psychologist.  (R. 558).  He expressed a history of depressive symptomology and felt that his academic difficulties hindered him from moving forward and achieving his goals.  (R. 558).  The Plaintiff explained that in sixth grade he was placed in the Exceptional Student Educational program, after being diagnosed with learning disorders in the areas of reading and writing, as well as a weakness in mathematics. (R. 558).  The Weschler Abbreviated Scale of Intelligence was administered and the Plaintiff was found to have a full scale IQ of 69, which placed him in the category of severely impaired/mentally deficient. (R. 560).  His performance IQ was found to be 77.  (R. 560).  The neuropsychologist stated that "the full scale IQ score is not considered to be an accurate summary of his overall intellectual abilities.  Rather, the performance IQ score is considered to be a more reliable estimate of his overall intellectual abilities at this time."  (R. 560).  The Plaintiff was found to read at second grade level, write at a first to second grade level, and his mathematics performance fell within the third grade level.  (R. 560).  The Plaintiff was found to have severely impaired range scores in the areas of mathematical calculations and work rate. (R. 560).  The Plaintiff was diagnosed with a GAF score of 61.[3] (R. 564).  Drs. Castellanos

---

[3] The GAF scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without considering any impaired functioning due to physical or environmental limitations. *Am. Psych. Ass'n., Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV") at 32 (4th ed. text rev.2000). A GAF score represents a subjective determination (based on a scale of 100 to 1) of a patient's overall level of functioning. *Id.* A GAF score of 41–50 indicates serious symptoms; a score of 51–60 indicates moderate symptoms; and a score in the range of 61–70

and Quiroga stated that while it was the Plaintiff's intention to attend a technical school program to receive training in automotive painting/bodywork, given the Plaintiff's level of intellectual and academic functioning, it was more appropriate for the Plaintiff to seek work as an assistant in an automotive body shop.  (R. 565).  Ultimately, the Plaintiff was diagnosed with a reading disorder, disorder of written expression, learning disorder not otherwise specified, major depressive disorder, and a cognitive disorder not otherwise specified.  (R. 564).

On November 6, 2013, the Plaintiff underwent a mental health evaluation conducted by an Agency doctor. (R. 539-543).  Dr. Vivian d.J. Gonzalez-Diaz, Ph.D., M.S., Psy PHARM completed an adult mental health information report.  (R. 539-543).   Dr. Gonzalez-Diaz found that the Plaintiff could understand and remember simple instructions and carry out simple instructions.  (R. 536).  The Plaintiff was found to have mild limitations in the ability to make judgments on simple work-related decisions and moderate limitations in his ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. (R. 536).  Dr. Gonzalez-Diaz found that the Plaintiff could interact appropriately with the public, supervisors, and co-workers.  (R. 537).  Dr. Gonzalez-Diaz also found that the Plaintiff would have moderate difficulty in responding appropriately to usual work situations and to changes in a routine work setting. (R. 537).   Dr. Gonzalez-Diaz performed a Weschler Adult Intelligence Scale, and the Plaintiff obtained a full scale IQ of 65 (placing him in the 1st percentile).  (R. 541).  This score placed the Plaintiff within the mildly deficient range of intellectual functioning.  (R. 541).  The Plaintiff obtained a Global Ability Index of 72 (borderline range), and Dr. Gonzalez-Diaz stated that the Global Ability Index was a better representation of the Plaintiff's cognitive potential.  (R. 541).  The

indicates mild symptoms. Id. at 32–34.  The use of a GAF score was discontinued in the fifth edition of the DSM.

Plaintiff was assigned a GAF score of 63.  (R. 543).  Dr. Gonzalez-Diaz found that the Plaintiff's prognosis and recommendation for treatment were fair/guarded and his prognosis for work integration was fair/guarded. (R. 543).   Dr. Gonzalez-Diaz found that based upon her evaluation, the Plaintiff would be able to manage his own benefits with help.  Dr. Gonzalez-Diaz provided her diagnostic impression as psychotic disorder (NOS), by history, prior history of learning disorder (NOS), borderline intellectual functioning (provisional), problems relating to academic underachievement, as well as physical impairments.  (R. 542).

> ### 2.  Physical Health History

While the Plaintiff has asserted a history of hypertension, kidney stones, migraines and asthma, in his Motion, the Plaintiff concentrates his argument on the Plaintiff's hand injuries.  Therefore, the undersigned does not find it necessary to address all of the Plaintiff's medical records, but only those relevant to the issues raised in the Parties' Motions.

On January 23, 2012, the Plaintiff reported to Jackson Memorial Hospital following an assault.  (R. 364). The Plaintiff reported that he had been hit by a bat multiple times and complained of bilateral hand pain.[4]  (R. 364).  The Plaintiff was admitted and diagnosed with bilateral hand fractures (a right Rolando fracture and a left scaphoid fracture).  (R. 366, 388).  On January 27, 2012, the Plaintiff underwent a closed reduction and percutaneous pinning of the Rolando fracture and an open reduction and internal fixation of the scaphoid fracture. (733). While in the hospital, the Plaintiff had an adverse reaction to Percocet and was subsequently prescribed Dilaudid for his pain.  (R. 383, 596).  The Plaintiff was discharged from the hospital on January 29, 2012.  (R. 586).  The discharge notes indicate that the Plaintiff was sent out on pain medications. (R. 586).

---

[4] This emergency room visit notation is the only notation where a baseball bat is described.  Everywhere else in the record, a 2X4 is referenced.

The Plaintiff's health records indicate that the Plaintiff is allergic to codeine, oxycodone and Percocet. (R. 669).

On February 6, 2012, the Plaintiff had a follow up visit at Jackson. (R. 378).  A physical examination found that the Plaintiff's sensation was intact in the ulnar, median, and radical distributions. (R .378).  Motor function was noted as being intact, and mild tenderness around the incision and fracture site was found. (R. 378).  An x-ray of the Plaintiff's left scaphoid fracture showed the screw in good position with signs of bone healing with some callus formation. (R. 378).  An x-ray of the right Rolando fracture showed good alignment of the bone with the pins intact.  (R. 378).  The Plaintiff was told that he would have his K-wire removed in about six weeks for the Rolando fracture on the right hand and in about eight to ten weeks on the left hand.  (R. 379).

On March 12, 2012, the Plaintiff's casts were removed, and the x-rays showed an unchanged left scaphoid fracture of the left hand. (R. 800).  The pins were removed from the Plaintiffs' right thumb, and no further immobilization was required.  (R. 800).  The Plaintiff's left hand was placed in a short-arm thumb spica cast.  (R. 800).  On March 26, 2012, the doctor noted a cannulated screw reducing the scaphoid fracture. (R.798).  There was no evidence of avascular necrosis. (R. 798).  The Plaintiff rated his pain at 7 out of 10.  (R. 799).

On April 2, 2012, the Plaintiff was seen again at Jackson Health Systems. The hard cast on his left hand was still present and he complained of minimal pain that did not require medication.  (R. 792).

On April 30, 2012, the doctor noted that the Plaintiff was using the bone stimulator as instructed. (R. 786).  The radiographs of the left wrist showed that the screw through the scaphoid bone was in place.  (R. 786).  The doctor observed some reabsorption of the bone and slight prominence of the screw and noted that the fracture line appeared to be

healing possibly through one of the cortex.  (R. 786).  The Plaintiff was placed back into a left thumb spica cast.  (R. 787).

On May 21, 2012, the Plaintiff's cast was removed again for a physical examination.  The Plaintiff's motor and sensory exams were found to be intact.  (R. 781). The Plaintiff denied any functional limitations on his right side. (R. 781).  There appeared to be a bridging bone in the left wrist and a CT scan was recommended. (R. 781).  On May 22, 2012, the Plaintiff had a CT scan of his left wrist which demonstrated no evidence of scaphoid healing and a loosening of the scaphoid screw along with avascular necrosis of the proximal scaphoid fracture fragment.  (R. 778-779).

On October 15, 2012, imaging studies revealed a persistent scaphoid fracture and continued nonunion in the left wrist.  (R. 733).  The Plaintiff's cast was replaced during the visit.  (R. 734).

On January 29, 2013, the Plaintiff underwent a second open reduction surgery and an internal fixation using a wedge graft from the left iliac crest as well as a cancellous bone graft from the left iliac crest.  (R. 815).  The Plaintiff's left wrist was placed in a splint and it was recommended that the splint remain for 10-14 days before being switched to a cast for a total of 8-10 weeks. (R. 928).

At his follow-up visit on February 7, 2013, the Plaintiff reported mild pain.  (R. 905). The Plaintiff's wrist was found to be stiff and the incision was found to be nicely healed. (R. 905).  On March 11, 2013, generalized osteopenia was found along with chronic ossific fragments along the radial styloid process.  (R. 901).  The doctor found a chronic fracture of the ulnar styloid process and soft tissue swelling. (R. 901).

On April 15, 2013, the Plaintiff was examined again and x-rays were obtained.  (R. 894).  During the exam, positive tenderness and restricted range of motion of the left wrist were noted.  (R. 894).  The generalized osteopenia remained unchanged from the

previous visit and the Plaintiff continued to have ulnar styloid fracture nonunion. (R. 895).

On June 3, 2013, the Plaintiff's cast use was discontinued and he was instructed to wear a removable wrist splint at all times. (R. 889). The Plaintiff denied pain, numbness or tingling. (R. 889). The notes state that "if he has significant pain, he will likely need a proximal row carpectomy, but if he has no pain or minimal pain he should likely live with this and be able to start work back at his regular job." (R. 890).

On November 4, 2013, the doctor found that the orthopedic hardware was unchanged. (R. 886). Osteopenia was noted along with diffuse loss of the intercarpal joint spaces especially between the capitate and lunate. (R. 886). The last treatment note from Jackson is dated December 16, 2013. (R. 877). A physical exam revealed sensation intact to light touch in the median, radial, and ulnar nerve distribution. (R. 877). The incision was found to be well healed, and the Plaintiff was able to make a thumbs-up sign, cross fingers, as well as make an okay sign. (R. 877). No pain was noted with stretch of the digits. (R. 877). X-rays revealed an unchanged ulnar styloid process fracture with mild degenerative changes in the radiocarpal and first carpometacarpal joints. (R. 879).

On November 14, 2013, the Plaintiff was seen by consultative physician Dr. Ubaldo S. Rodriguez. (R. 545-555). Dr. Rodriguez stated that the Plaintiff had a lot of difficulty using his left wrist and hand and had stopped working at the Pizza restaurant where he was employed because of his injury. (R. 545). The Plaintiff reported that he did not take pain killers because of "multiple allergies." (R. 545). The physical examination revealed that the Plaintiff had a lot of difficulty opening a door knob with his left hand and had some difficulty picking up coins with his left hand. (R. 545). X-rays taken at the exam revealed a non-healed fracture of the styloid process ulna. (R. 546). Dr. Rodriguez completed a medical source statement and found that Plaintiff's left hand would never be

9

able to lift or carry a box up to ten pounds.  (R. 550).  Additionally, Dr. Rodriguez found that the Plaintiff would never perform the following activities with his left hand: reaching (overhead), reaching (all other), handling, fingering, feeling, and push/pulling.   (R. 552). Dr. Rodriguez also noted that the Plaintiff would never be able to climb a ladder or scaffold or crawl. (R. 555).

### 3. Hearing Testimony

#### 1. Plaintiff's Testimony

An administrative hearing was conducted on January 30, 2014, in Miami, Florida, and was attended by Plaintiff and his counsel. (R. 34-96). Steve Bast, an impartial vocational expert, also testified by telephone at the hearing.  The Plaintiff testified that he graduated from high school with a special diploma after repeating the twelfth grade.  (R. 40).  The Plaintiff stated that he was not able to read or write.  (R. 40).  Regarding his assault, the Plaintiff testified that when he was coming home from work, two men attacked him with a two-by-four and his hands were broken in pieces.  (R. 40).  The Plaintiff explained that he was fired from his job when he returned to work with both hands in casts.  (R. 41).

The Plaintiff testified that his learning disability was caused by being born with the umbilical cord around his neck which resulted in a loss of oxygen to his brain.  (R. 41).  He stated that there had been two surgeries performed on his left hand and one on his right hand.  (R. 41).  The Plaintiff reported that he was not taking any codeine medication because of an allergy, but still reported pain in his hands.  (R. 41-42).   The Plaintiff testified that he had asthma, and migraines that lasted twelve hours a day. (R. 43).   The Plaintiff also reported having problems with his back, feet and kidneys.  (R. 43-44).  The Plaintiff testified he could lift eight to ten pounds with his right hand for about a minute to two minutes.  (R. 46).  The Plaintiff also asserted that he was not able to place

his right hand in certain positions (R. 46).  The Plaintiff also testified that he took Advil
for pain. (R. 61).

      The Plaintiff testified regarding his work history including a job at the Youth Fair
at the beginning of 2013.  (R. 47).  He testified that he got the job through a family
member, and the job consisted of blowing a whistle when a "train" that conveyed people
was departing.  (R. 49).   Prior to his assault, the Plaintiff testified that he worked at a
Pizza restaurant at the airport where he put pizzas in the oven and cleaned, mopped, and
handled tanks of sauce. (R. 49).  The Plaintiff testified that he also previously worked for
Host International at the airport where he would stock the store and make sure the store
was organized and clean. (R. 50).  He testified that he lost the job because he "gave the
wrong change."  (R. 50).  The Plaintiff also worked previously as a valet parking cars, and
as an assistant pool cleaner.  (R. 51-52).

      In terms of the Plaintiff's daily life, the Plaintiff testified that he lives with his
mother and stays at home while she goes to work.  (R. 52).  He reported that he does not
do any cooking or cleaning.  (R. 53).  The Plaintiff also testified that he had trouble
sleeping due to pain.  (R. 55).

      As related to his literacy, the Plaintiff testified that when he applied for jobs, he
wouldn't write out the applications but would bring in a paper that his school had given
him that included his information.  (R. 55). He testified that he could read a little bit but on
the job he always received verbal instructions and could only work in physical labor.  (R.
56-57).

      The Plaintiff testified that he is able to drive using one hand.  (R. 60).  The Plaintiff
stated that he was able to dress and bathe himself, open zippers and buttons using one
hand, and was not able to grab objects.  (R. 62).

2. <u>Vocational Expert Testimony</u>

The VE, Mr. Bast, testified by phone at the hearing.  The ALJ presented the

following hypothetical

> This is hypo number one.  In the hypo, please consider that
> the claimant's main dominant hand is the right hand, okay.
> So in this first hypo assume that the claimant is able to lift
> and carry twenty pounds occasionally, ten pounds frequently
> with the right hand; standing and walking he will be able to
> stand and/or walk for six hours total in an eight-hour
> workday; pushing and pulling will be the same amount of
> weight as in lifting and carrying; occasionally he will be able
> to climb ramps or stairs—just give me a moment—pushing
> and pulling will be the same amount of weight with lifting and
> carrying like I said before, if I failed to mention it, please
> consider that, only with the right hand.  He will not be able to
> perform any activities regarding climbing ladders, ropes, or
> scaffolds; working heights, exposed places; or that requires
> to [sic] from machinery, mechanical parts.
> He will not be able to perform any activities requiring
> handling or fingering with the left hand or reaching above the
> shoulder level with the left hand.  The use of the left hand will
> be limited only as to guide a large object of more than six
> inches.
> Mentally, he will be limited to performing simple,
> routine, repetitive tasks.  He will be able to understand,
> remember and carryout simple instructions.  However, the
> instructions must be presented to the claimant by
> demonstration, not in writing.  Assuming these limitations,
> can the claimant perform any of this past relevant work,
> actually perform any of his past relevant work, actually
> performed or as they are performed in the national economy?

(R. 72).

The VE responded that he Plaintiff would not be able to perform any past relevant

work.   The ALJ then asked if there were any other jobs that the hypothetical individual

could perform in the local, regional economy.  (R. 73).  The VE identified the positions of

outside deliverer, which the VE afforded a 20% erosion due to handling; storage facility

rental clerk, which the VE afforded at least a  25% erosion to reflect that rental clerks

exchange money, type, and complete paperwork; and a flagger at a construction site,

road site or parking lot.  (R. 74).

When questioned by the Plaintiff's attorney, the VE suggested that the Plaintiff could be employed as an outside deliverer for little packages like blood samples. (R. 78). The VE also testified that a hypothetical claimant would be able to perform the job with a first-grade writing level, and a second-grade reading level. (R. 81). The VE also testified that the Plaintiff's difficulty in recording deliveries on a clipboard would amount to a tiny erosion in the amount of jobs available. (R. 82). The VE ultimately eliminated the storage facility rental clerk position due to the Plaintiff's limited literacy. (R. 83).

There was a discussion at the hearing regarding whether the Plaintiff wore a splint or a removal cast. (R. 89-90). The ALJ did not agree that the Plaintiff's device was a "removal cast." (R. 90). Counsel for the Plaintiff described the device as a wrist splint going about a third to halfway up the Plaintiff's forearm and noted that the device was to be worn at all times except for hygiene purposes. (R. 91). The VE testified that there would be additional 25% erosion in the flagger position, plus a 10% erosion because the Plaintiff could only use one hand to hold the flag. (R. 91). The VE also stated that the deliverer positon should be eroded a further 15% due to the Plaintiff's reading and writing level.

IV. **LEGAL FRAMEWORK**

A. **Standard of Review**

Judicial review of the ALJ's decision in a disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's factual findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as

adequate to support a conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.

1997); *Bloodworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

      When reviewing the evidence, the Court may not reweigh evidence or substitute

its judgment for that of the ALJ, and even if the evidence "preponderates" against the

Commissioner's decision, the reviewing court must affirm if the decision is supported by

substantial evidence.  *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Baker v.

Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989).  This restrictive standard of review, however,

applies only to findings of fact.  No presumption of validity attaches to the

Commissioner's conclusions of law, which are reviewed *de novo*, including the

determination of the proper standard to be applied in reviewing claims.  *Cornelius v.

Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("The Commissioner's failure to apply

the correct law or to provide the reviewing court with sufficient reasoning for

determining that the proper legal analysis has been conducted mandates reversal.");

*Martin v. Sullivan*, 894 F.2d at 1529.

### B.  The Five Step Sequential Analysis

      The Social Security Administration applies a five-step sequential analysis to make

a disability determination. 20 C.F.R. §§ 404.1520(a), 416.920(a).  The analysis follows each

step in order, and the analysis ceases if, at a certain step, the ALJ is able to determine,

based on the applicable criteria that the claimant is disabled, or that the claimant is not

disabled.

### 1.  Step One

      Step one is a determination of whether the claimant is engaging in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  "Substantial work activity" is work

activity that involves doing significant physical or mental activities. 20 C.F.R. §§

404.1572(a), 416.972(a).  "Gainful work activity" is work that is usually done for pay or

profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If an

individual has been participating in substantial gainful activity, he or she will not be considered disabled, regardless of physical or mental impairment, despite the severity of symptoms, age, education, and work experience.  *Id.*  The analysis proceeds to step two if the individual is not engaging in substantial gainful activity.

In the case at bar, the ALJ found that Plaintiff had not engaged in substantial activity since January 23, 2012, the alleged onset date.  (R. 13).

### 2.  Step Two

At the second step, the claimant must establish that he has a severe impairment. 20 C.F.R. 404.1520(c).  The ALJ must make a severity determination regarding the claimant's medically determinable impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).  "There is no need for an ALJ to identify every severe impairment at step two."  *Tuggerson-Brown v. Commissioner of Social Security*, No. 13-14168, 2014 WL 3643790, at *2 (11th Cir. Jul. 24, 2014).

At step two the ALJ found that the Plaintiff had the following severe impairments: obesity, status post fracture of left wrist with severe post traumatic radial osteoarthritis, status port [sic] healed fracture of right first metacarpal without osteoarthritis, depression, borderline intellectual functioning, and learning disability. (R. 14).

The ALJ found that the Plaintiff also had a history of hypertension and asthma; however, the ALJ found that those impairments did not cause the Plaintiff more than minimal functional limitations in the Plaintiff's ability to perform work activities. Therefore, the ALJ found that the Plaintiff's history of hypertension and asthma were non-severe impairments. (R. 14).

Because the ALJ found that the Plaintiff had a least one sever medically determinable impairment or combination of impairments, however, the process advanced to the third step.

**3. <u>Step Three</u>**

The third step required the ALJ to consider if the Plaintiff's impairment or combination of impairments were at the level of severity to either meet or medically equal the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1. (commonly referred to as the "Listings"). 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. A Plaintiff is considered to be disabled if her impairment or combination of impairments: 1) is severe enough to meet or to medically equal the criteria of a listing; and, 2) meets the duration requirement under 20 C.F.R. §§ 404.1509, 416.909.

Here, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impartments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 186). The Plaintiff challenges the ALJ's finding at this step, contending that the Plaintiff me Listing 1.07, which governs fractures of upper extremities and Listing 12.05, which governs intellectual disability.

**4. <u>Step Four</u>**

Step four is a two-pronged analysis that involves a determination of whether the impairments prevent the Plaintiff from performing his past relevant work. First, the ALJ must make a determination of the Plaintiff's Residual Functional Capacity ("RFC") as described in 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC measures a person's ability to do physical and mental work activities on a sustained basis despite limitations caused by his impairments. In making this determination, the ALJ must consider all of the claimant's impairments, regardless of the level of severity. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96-8p; *Tuggerson-Brown,* 2014 WL 3643790, at *2 (an

16

ALJ is required to consider all impairments, regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation).

The ALJ found that the Plaintiff had the RFC to perform a reduced range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  (R. 17).  The ALJ found that the Plaintiff can lift, carry, push, and/or pull twenty pounds occasionally and ten pounds frequently with his right hand.  (R. 17).  The ALJ found that the Plaintiff can sit for six hours total in an eight-hour work day, and can stand and/or walk for six hours total in an eight-hour work day. (R. 17).  The ALJ noted that the Plaintiff could never climb ladders, ropes, or scaffolds, reach above the shoulder, engage in gross manipulation (handling), or fine manipulation (fingering) with the left hand.  (R. 17).  The ALJ also noted that the Plaintiff could never work in close proximity to moving, mechanical parts or work in high exposed places, although the Plaintiff could occasionally climb ramps or stairs.  (R. 17).  The ALJ found that the Plaintiff's use of his left hand would be limited to use as a guide for objects.  (R. 17).

In terms of the Plaintiff's mental impairments, the ALJ found that the Plaintiff retained his ability to perform simple routine and repetitive tasks.  (R. 17).  The ALJ stated that the Plaintiff is able to understand, remember, and carry out simple instructions; however, the instructions must be presented to the Plaintiff by demonstration instead of written form. (R. 17).

The Plaintiff challenges the ALJ's determination at this step and contends that the ALJ's opinion does not describe any evidence. As required by Social Security Ruling 96-8P,  that supports his finding that the Plaintiff can use his left hand "as a guide for objects," and that this finding is not supported by substantial evidence.  The Plaintiff also challenges the ALJ's failure to properly evaluate the psychoeducational evaluation report, and the evaluation of his credibility, which are relevant to the RFC determination.

The second phase of step four required the ALJ to make a determination of whether the Plaintiff had the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).  Relevant work has been defined as work performed within the last 15 years and performed long enough so that 1) the claimant could learn to do the job; and, 2) be considered substantial gainful activity.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  During the second part of step four, the ALJ made the determination that the Plaintiff was unable to perform any past relevant work.  (R. 22).

5.  <u>Step Five</u>

If the claimant is not able to perform his past relevant work, the ALJ progresses to the fifth step.  At this step, the burden of production shifts to the Commissioner to show that other work that Plaintiff can perform exists in significant numbers in the national economy.  *Jones v. Apfel*, 190 F.3d 1224, 128 (11th Cir. 1999); 20 C.F.R. §§ 404.1520(g), 416.920(a)(4)(v).  In making this determination, the ALJ considers a claimant's RFC, age, education, and work experience to determine if the claimant can perform any other work. If the claimant can perform other work, the ALJ will make a finding that the claimant is not disabled.

At this step, the ALJ considered Plaintiff's age, education, work experience, RFC, and, based on the testimony of the VE, found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including outside deliverer, storage facility rental clerk[5], and flagger.  (R. 23).

The Plaintiff challenges this step of the analysis, arguing that substantial evidence does not support the ALJ's finding that there are jobs that exist in significant numbers that the Plaintiff can perform.

---

[5] Although the ALJ included this job in his Decision, the undersigned notes that the VE ultimately excluded this job based upon the Plaintiff's first grade writing and second grade reading abilities.  (R. 84).

## V.   LEGAL ANALYSIS

### A.   Issue Number 1: The ALJ's Consideration of the Relevant Evidence

#### 1.   ALJ's Finding Regarding the Plaintiff's Severe Impairments

The Plaintiff asserts that the ALJ failed to include the Plaintiff's nonhealed fracture of the styloid process ulna as a severe impairment and also asserts that this condition meets or medically equals the severity of the listed impairment of 20 C.F.R Part 404, Subpart 9, Appendix 1, Listing 1.07.  The Defendant argues that the Plaintiff's wrist fracture does not meet the criteria of Listing 1.07.[6]

In his decision the ALJ found that the Plaintiff had the severe impairment of "status post fracture of left wrist with severe post traumatic radial osteoarthritis." (R. 14). The ALJ further stated that he had "considered all of the impairments under 404, Subpart P, Appendix 1, including the listing for musculoskeletal disorders contained in 1.00 (including 1.07) in concluding that the Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Thus, the ALJ considered the Plaintiff's wrist fracture to be a severe impairment.  This is evideny not only from the above statement, but from the fact that the ALJ's RFC determination included limited use of the left wrist.

Listing 1.07 requires a "fracture of an upper extremity with non-union of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset."

The Defendant asserts the Plaintiff does not meet the listing as the "styloid process ulna" is not the equivalent of the "ulna."  Listing 1.07 clearly states that that there must be a non-union of a fracture of the **shaft** of the ulna.   There is nothing in the

---

[6] The Defendant does not dispute that the Plaintiff has a nonhealed fracture of the styloid process ulna.

medical record to indicate that the Plaintiff has a non-healed fracture of the shaft of the ulna, but rather a non-healed fracture of the styloid process ulna.  It is not the position of the reviewing court to second guess the ALJ when the ALJ states in the decision that the listing was considered, and the listing clearly describes the medical condition.[7] Substantial evidence supports the ALJ's conclusion that the Plaintiff does not meet listing 1.07.

### 2.  Back Pain and Headaches

The Plaintiff asserts that the ALJ failed to consider a CT scan which documents the Plaintiff having "partial sacralization of the L5 on the right" and the Plaintiff's medical record indicating that the Plaintiff suffered from frontal headaches that last between 12-14 hours.  The Defendant did not respond to this point in its response to the Plaintiff's Motion.

At the hearing, the Plaintiff testified that he had migraines almost every day that would last sometimes 12 hours a day.  (R. 43).  One of the Plaintiff's medical records dated July 20, 2012, notes that the Plaintiff has been having headaches for many years, 3-4 days a week.  (R. 764).  The Plaintiff reported that nausea and vomiting accompanied the headaches.  The Plaintiff reported that the frequency of the headaches had decreased as the result of lifestyle modifications.  (R. 764).  The doctor noted that the headaches had typical features of a migraine but because "there are not alarm symptoms going with this headache and because the patient is with the nausea, reglan (metoclopramida and naproxen) are going to be prescribed."  (R. 764).

---

[7] The "styloid process of the ulna" has been defined as "a small projection that descends from the posterior portion of the ulnar head.  It is an attachment point for the ulna collateral ligament, which connects the ulna to the triquetral and pisiform carpal bones at the wrist."   The "ulna head" is "a small, rounded eminence at the distal end of the ulna." https://www.getbodysmart.com/ap/skeletalsystem/skeleton/appendicular/upperlimbs/radi usulna1/print4.html. (last visited March 31, 2017).

The Plaintiff claims that the ALJ did not mention the hospital records related to the headaches anywhere in his Notice of Decision.  However, in making his RFC determination, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence."  (R. 17).  Additionally, the ALJ noted in his decision that the Plaintiff testified regarding his migraines and his back pain. (R. 18).  The Eleventh Circuit has found that similar statements are enough to demonstrate that the ALJ considered all necessary evidence.  *See, Tuggerson-Brown v. Commissioner of Social Security*, No. 13-14168, 2014 WL 3643790, at *2 (11th Cir. Jul. 24, 2014).   Therefore the record reveals that the ALJ did consider the Plaintiff's headaches and back issues.

### 3.  Pain Medication

The Plaintiff asserts that the ALJ did not consider the Plaintiff's testimony at the hearing regarding the Plaintiff's allergy to codeine.  The Plaintiff does not make a specific argument as related to this point, and the Defendant does not address the issue in the Defendant's response to the Plaintiff's motion.

The ALJ noted in his decision that "the claimant has not taken any narcotic based pain relieving medications in spite of the allegations of quite limiting pain.  In fact, the claimant testified that he takes over the counter Advil for his pain."  (R. 20).

The Plaintiff's medical records indicate that while in the hospital, the Plaintiff had an adverse reaction to Percocet and was subsequently prescribed Dilaudid for his pain.  (R. 383, 596).   While this allergy may explain why the Plaintiff was not taking any pain medications that would cause an allergic reaction, the ALJ's decision refers to narcotic based pain relieving medications, not simply codeine based pain medications. Therefore, it was not error for the ALJ to state that the Plaintiff was not taking any narcotic based pain medications in spite of his allegations of limiting pain, and to consider this fact in  his decision.

4.  <u>**Working After Assault**</u>

The Plaintiff provides excerpts of the ALJ's Decision and the Plaintiff's testimony as related to the Plaintiff's employment after his assault.  The Plaintiff does not make any arguments as related to this issue and the Defendant does not respond.  Based upon the Plaintiff's testimony, the ALJ's Decision incorrectly states that the Plaintiff worked at the pizza restaurant after the Plaintiff's injury.  The ALJ incorrectly found that "this work activity evidences greater functioning than alleged."  Because the ALJ's decision is being remanded on other grounds, the ALJ shall also re-consider the Plaintiff's testimony as related to his employment after his assault, noting that the Plaintiff was not employed in his previous position at the Pizza restaurant after his assault.

5.  <u>**High School Education**</u>

The Plaintiff asserts that the ALJ's finding that the Plaintiff has at least a high school education was not an accurate representation of the Plaintiff's education for the purposes of assessing the Plaintiff's vocational abilities.  The Defendant does not respond to the Plaintiff's argument.

The record evidence reveals that the Plaintiff received a special diploma and was enrolled in special education classes while in high school. (R. 339-340).  Therefore, the ALJ's finding that the Plaintiff has "at least a high school education" is not entirely accurate.  On remand, the ALJ shall reconsider the Plaintiff's transcripts and more accurately reflect the Plaintiff's educational background, including the fact that the Plaintiff received a special diploma.

B.  <u>**Issue No. 2: The ALJ's Determination that the Plaintiff's Impairments Did not Meet or Medically Equal the Criteria of Listing 12.05**</u>

The Plaintiff asserts that the ALJ wrongly determined that the Plaintiff's impairments considered singly and in combination, do not meet or medically equal the criteria of listing 12.05, specifically the paragraph C criteria.  The Defendant asserts that

22

the ALJ properly evaluated the Plaintiff's mental impairment under listing 12.05, and

substantial evidence supports the ALJ's decision.

Listing 12.05 states:

Intellectual disability:  Intellectual disability refers to
significantly subaverage general intellectual functioning with
deficits in adaptive functioning initially manifested during the
developmental period, i.e., the evidence demonstrates or
supports onset of the impairment before age 22.  The
required level of severity for this disorder is met when the
requirements in A, B, C, or D are satisfied.

A.  Mental incapacity evidenced by dependence upon others for
personal needs (e.g., toileting, eating, dressing, or bathing)
and inability to follow directions, such that the use of
standardized measures of intellectual functioning is
precluded;
OR

B.  A valid verbal, performance or full scale IQ of 59 or less;
OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70
and a physical or other mental impairment imposing an
additional and significant work-related limitation or function;
OR

D.  A valid verbal, performance, or full scale IQ of 60 through 70
resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence,
or pace; or
4.  Repeated episodes of decompensation, each of an extended
duration.

In his decision the ALJ found that the Plaintiff did not meet the criteria under

listing 12.05 paragraphs A, B, C, or D.  Despite a detailed discussion of these paragraphs,

the ALJ did not address whether the Plaintiff met the requirements of the introductory

paragraph.  The undersigned notes that it would not be necessary to reach the

specifically examined paragraphs if the criteria of the introductory paragraph were not

met.  For the reasons set forth below, the undersigned finds that he ALJ erred as a

23

matter of law in determining that the paragraph C criterion was not met, and the case must be remanded for the ALJ to consider whether the requirements of the introductory paragraph were met.

With respect to paragraph C, the ALJ stated that the criteria for the listing was not met, and noted that at the consultative examination on November 6, 2013, the Plaintiff achieved a full-scale IQ score of 65.  The ALJ explained that the criterion was not met because the examiner noted that "based upon her analysis of the scores obtained, it did not appear that the claimant was truly functioning within the mildly deficient range of intellectual ability, but rather within the borderline range."  (R. 16-17).  Furthermore, the ALJ noted that the historical medical evidence revealed that the claimant's past IQ scores were higher and the ALJ therefore found that the Plaintiff's IQ scores were not an accurate representation of his intelligence and that the Plaintiff's actual IQ score fell within the borderline range (over 70). (R. 17).

A review of the Plaintiff's medical record reveals that when the Plaintiff was evaluated at Michele Quiroga, Ph.D., and Associates, P.A., in 2007, the Plaintiff was assigned a verbal IQ of 65, performance IQ of 77, and a full scale IQ of 69.  (R. 560).  In the report, the examiner noted that "the full scale IQ score is not considered to be an accurate summary of his intellectual abilities.  Rather, the performance IQ score is considered to be a more reliable estimate of his overall intellectual abilities at this time, and was used to identify academic strengths and weaknesses."  (R. 560).

As noted above, a second IQ test was administered on November 6, 2013.  (R. 539-542).  The Plaintiff obtained verbal comprehension index of 68, a perceptual reasoning index score of 79, full scale IQ of 65, and a global ability index of 72.  The examiner noted that "although the results are valid, it appears that his GAI is a better representation of his cognitive potential."  (R. 541).

Because the Plaintiff's IQ scores are all valid scores, and the requirements of paragraph C are met when any one of the scores for verbal, performance or full scale IQ of 60 through 70 are met, the paragraph C criterion is met.[8]

In addition to meeting the paragraph C criteria, however, Listing 12.05 requires that the Plaintiff also meet the criteria for the introductory paragraph. *O'Neal v. Comm'r of Soc. Sec.,* 614 F. App'x 456, 459 (11th Cir. 2015). The Defendant argues that the Plaintiff cannot satisfy this requirement, and points to various parts of the record and the ALJ's discussion of other criteria to support it position that the Plaintiff did not meet the criteria because he had not been diagnosed with an intellectual disability or mental retardation. As discussed below, however, the cases upon which the Defendant relies do not sweep as broadly as the Defendant claims and the ALJ must determine this issue in the first instance. In *O'Neal,* the Eleventh Circuit explained that in order to qualify under listing 12.05, the Plaintiff must first meet the diagnostic criteria in 12.05's introductory paragraph. In other words, the Plaintiff "must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22. *Id.* (internal citations omitted). In *Jordan v. Comm'r or Soc. Sec. Admin.,* 470 F.App'x. 766, 768 (11th Cir. 2012), the Court affirmed the determination that a claimant who completed 11th grade, was able to read and write, and was diagnosed with borderline intellectual functioning did not meet the criteria under the introductory paragraph of 12.05. The undersigned recognizes that the Court stated that a diagnosis of "borderline intellectual functioning" is mutually exclusive of mental retardation, but that opinion was unpublished and it is not clear that the Plaintiff in the case at bar does not meet the requirement of "significantly subaverage general intellectual functioning."

_____

[8] There is no claim in the present case, nor could there be, that the Plaintiff does not meet the additional paragraph C requirement of an additional significant work-related limitation based on his wrist injury.

25

Here, the Plaintiff argues that the Plaintiff meets the factors of the introductory paragraph as the Plaintiff was in special education classes, repeated twelfth grade, and graduated with a special diploma.  While the Plaintiff's records indicate a more severe disability than alleged in *Jordan*, it is not proper for this Court to make that determination in the first instance, either in favor of the Plaintiff or in favor of the Defendant.  Similarly, the undersigned will not make the initial determination of whether the Plaintiff meets the requirements of deficits in adaptive functioning.  The ALJ should make this determination in the first instance on remand.

C. <u>Issue Number 3: Determination of the Plaintiff's Residual Functional Capacity ("RFC")</u>

The Plaintiff asserts that the ALJ erred in failing to identify or describe in his decision any evidence that supports the ALJ's conclusion that the Plaintiff can use his left hand "as a guide for objects."  The Defendant asserts that substantial evidence supports the ALJ's finding that the Plaintiff's "use of his left hand would be limited to use as a guide for objects."

In his Decision, the ALJ determined that the Plaintiff could never climb ladders, ropes, or scaffolds, reach above the shoulder, engage in gross manipulation (handling), or fine manipulation (fingering) with the left hand.  (R. 17).  The ALJ also noted that the Plaintiff could never work in close proximity to moving, mechanical parts or work in high exposed places, although the Plaintiff could occasionally climb ramps or stairs.  (R. 17).  The ALJ found that the Plaintiff's use of his left hand would be limited to use as a guide for objects.  (R. 17).  These limitations were incorporated into the hypothetical provided to the vocational expert at the hearing.

While it is not true that as the Plaintiff contends, that Dr. Rodriguez concluded that the Plaintiff can "NEVER do anything at all with his left hand," the ALJ does not point to anything in the record to support his conclusion that the Plaintiff can use his left hand as

a guide for objects, and Dr. Rodriguez's report lists several limitations that would indicate that in fact the Plaintiff would have difficulty using his hand as a guide for objects.   The Plaintiff is correct that Social Security Ruling 96-8P requires the ALJ to describe how the evidence supports the conclusion that the Plaintiff can use his left hand as a guide for objects. Because the ALJ failed to cite to any such evidence in the record, the case is remanded for the ALJ to re-evaluate the Plaintiff's RFC. The ALJ shall then present the new RFC to the VE.[9]  Additionally, because there are several issues related to the device worn by the Plaintiff, the VE should be afforded the opportunity to view the device.

> D.   Issue Number 4: Weight Accorded to the Psychoeducational Evaluation

The Plaintiff asserts that the ALJ failed to analyze or accord a weight to the psychoeducational evaluation report from Michele Quiroga, Ph.D. and Associates, P.A. The Defendant asserts that it is not necessary for the ALJ to assign a weight to the report as long as the court can determine what requirements the court applied. The Defendant further asserts that the Plaintiff has failed to explain how assigning a weight to the report would have changed the ALJ's decision.

An ALJ is required to consider and explain the weight given to different medical doctors such as examining and consulting physicians.  *See McCloud v. Barnhart*, 166 F. App'x 410, 419 (11th Cir. 2006).  The ALJ is required "to state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error."  Kahle v. *Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1362, 1271 (M.D. Fla. 2012) (citing *Sharfarz v. Bowen,* 825 F. 2d 278, 279 (11th Cir. 1987)).

Here, the ALJ not only failed to assign a weight to the report but also failed to analyze or discuss the report in any way.  This is error, and it is possible that the

---

[9] The ALJ also failed to include the Plaintiff's limitations regarding math and writing in the RFC assessment. On remand, the ALJ shall formulate the RFC based upon the record as a whole.

information contained in the report might affect the RFC analysis, as well as the new determination of whether listing 12.05 was met.  Therefore, on remand, the ALJ shall also consider the opinions contained in the psychoeducational report and assign a weight in accordance with the regulations.

      E.  **Issue Number 5:  Whether the ALJ Failed to Fully Develop the Record**

The Plaintiff asserts that the ALJ failed to develop the record and took an adversarial role in the hearing as related to the device worn by the Plaintiff on his left wrist.  The Plaintiff asserts that it was incorrect for the ALJ to describe the device as "just an elastic support for the wrist area."  The Plaintiff argues that the ALJ's reluctance to help fully and accurately describe the Plaintiff's wrist immobilization device to the VE, who was testifying by telephone, was a violation of the ALJ's duty to conduct a non-adversarial hearing and of the ALJ's duty to help fully develop the record.

The Defendant asserts that the ALJ met his obligation to fully and fairly develop the record by permitting the Plaintiff's attorney to question the VE.

Because, as outlined above, the case is being remanded for the ALJ to formulate a new RFC and present new hypotheticals to the VE in person, the undersigned does not find it necessary to discuss the merits of the Plaintiff's claim related to the hearing testimony.  The undersigned does not agree with the contention that because the ALJ did not agree that the device was a "removable cast" that this amounted to converting the hearing into an adversarial proceeding.  The ALJ did not prevent the Plaintiff's counsel from describing the device as the Plaintiff's counsel saw fit, and there is nothing in the record to indicate that the Plaintiff was not afforded his right to a non-adversarial hearing.

      F.  **Issue Number 6: The ALJ's Determination of the Plaintiff's Credibility**

The Plaintiff asserts that substantial evidence did not support the ALJ's credibility determination.  The Plaintiff argues that some inconsistencies in the testimony of an

individual with the Plaintiff's IQ are to be expected.  The Plaintiff also argues that the Plaintiff's allegations of pain and disability are fully supported by the objective evidence in the Plaintiff's file.

The Defendant asserts that substantial evidence supports the ALJ's credibility finding and argues that the Plaintiff's contention that inconsistencies in the Plaintiff's testimony should be expected due to the Plaintiff's IQ level only supports the ALJ's finding that the Plaintiff made inconsistent statements.

The responsibility of the fact-finder, the ALJ, is to weigh the Plaintiff's complaints about his symptoms against the record as a whole; this falls to the ALJ alone to make this determination.  20 C.F.R. §§ 404.1529(a), 416.929(a).  A clearly articulated credibility finding supported by substantial evidence in the record will not be disturbed by a reviewing court.  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). "[T]he ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).  If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so.  *Hale v. Bowen,* 831 F. 2d 1007, 1011 (11th Cir. 1987).  A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir.1982).  That determination, however, may be affected by the lack of a fully developed record, and should be revisited on remand.   For this, the ALJ must examine the entire record.

Here, the ALJ found that in terms of the Plaintiff's alleged impairments, that the testimony and statements of the Plaintiff regarding persistence, severity, and limiting effects of his impairments are not fully credible. (R. 20).  In the first instance, the ALJ found that the Plaintiff made inconsistent statements related to his ability to read and write.  The ALJ argues that because the Plaintiff admitted that he was able to read a few

words including an exit sign and some street signs, his earlier contention that he could not read was inconsistent.  The record corroborates the Plaintiff's testimony that he is able to read at a very limited level (read at a second grade level and write at a first to second grade level).  (R. 560).  Having the ability to read an exit sign and a few street signs is not inconsistent with the Plaintiff stating he was not able to read.  The Plaintiff testified that when he was employed instructions were given to him verbally, and that he was unable to fill out a job application.  (R. 55-56).

As related to the Plaintiff's testimony regarding hallucinations, the ALJ is correct in pointing out that the Plaintiff's statement that he experienced auditory hallucinations every day and saw spirits was inconsistent with his testimony at the hearing that he had not experienced any hallucinations in over two years.   The Plaintiff admitted to this inconsistency at the hearing.  (R. 62).

In his Decision, the ALJ discusses the Plaintiff's testimony at the hearing regarding his ability to perform household chores.  The Plaintiff does not address this point in his Motion.  The ALJ, in accordance with the regulations, cites to the portions of the Plaintiff's hearing testimony which supports the ALJ's finding the testimony of the Plaintiff regarding the persistence, severity, and limiting effects of his impairments is not wholly consistent.  The Plaintiff testified that he was able to drive, prepare simple meals, clean dishes, and keep his room tidy.  (R. 61, 64).

It is not the position of the reviewing Court to re-weigh the evidence of the case but instead to determine whether substantial evidence supports the conclusion of the ALJ. Despite the fact that the undersigned finds that the inconsistency regarding the Plaintiff's reading limitations was not supported by the record, the inconsistencies regarding other matters was supported. Therefore, the undersigned concludes that the ALJ clearly articulated his credibility finding based upon substantial evidence of the record.

G.  **Issue Number 7:  Whether Substantial Evidence Supports the ALJ's Finding That There are Jobs that Exist in Significant Numbers that the Plaintiff Can Perform**

The Plaintiff asserts that because the VE stated at the hearing that the three occupations that the Plaintiff could perform "are representative of a very small number of comparable occupations," substantial evidence does not support the ALJ's decision that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.

The Defendant asserts that even given the VE's statement, the representative jobs constitute a significant number of jobs nationally.

Because the undersigned has found that the ALJ shall perform a new RFC, and present a new hypothetical to the VE, it is not necessary to determine whether substantial evidence supports the ALJ's Decision at this step.

The hearing testimony reveals that the VE was somewhat confused regarding the physical limitations of the Plaintiff's left hand as well as concerning the Plaintiff's reading and writing ability, and because the VE was provided with a hypothetical that included the ability to use the hand as a "guide for objects" the record needs to be developed further as related to the existence of jobs in the national economy in accordance with the new RFC evaluation.

VI.    **CONCLUSION**

The undersigned finds that substantial evidence does not support the ALJ's conclusion that the Plaintiff does not meet the listings for mental impairments under 12.05 (C), and the ALJ committed error as related to his evaluation of the record.

Therefore, based on the foregoing, this Court finds that substantial evidence does not support the ALJ's RFC determination.  The case shall be remanded for the ALJ to: (1) determine whether the requirements of the introductory paragraph to Listing 12.05 are

met; (2) re-evaluate the Plaintiff's residual functional capacity in accordance with the record as a whole either eliminating "the use of the left had as a guide," or citing evidence in the record or obtaining medical opinions to support that finding; (3) analyze and assign a weight to the psychoeducational evaluation report; (4) re-consider the Plaintiff's testimony as related to the Plaintiff's return to his previous employment after his assault; (5) reconsider the Plaintiff's educational transcripts; and (6) present a new hypothetical to the VE.  Therefore, in accordance with the above, it is herby

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment, ECF No. [24], is **GRANTED**, and that Defendant's Motion for Summary Judgment, ECF No. [29], is **DENIED**.  This matter is **REMANDED** to the Commissioner pursuant to 42 U.S.C § 405(g), as outlined above.

**DONE AND ORDERED** in chambers in Miami, Florida on March 31, 2017.

_Andrea M. Simonton_
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies provided via CM/ECF to:
All counsel of record